Frank W. Volk, Chief Judge
United States Bankruptcy Court
Southern District of West Virginia

Dated: December 1st, 2017

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

| IN RE: | CASE NO. 2:14-bk-20211 |
|---|---|
| BOBBY KEITH ADKINS, | CHAPTER 7 |
| Debtor. | JUDGE FRANK W. VOLK |
| QUALITY CAR AND TRUCK LEASING, INC., | ADVERSARY PROCEEDING NO. 2:14-ap-2082 |
| Plaintiff, v. | |
| BOBBY KEITH ADKINS, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Pending is Plaintiff Quality Car and Truck Leasing, Inc.'s Notice of Additional Issues for Adjudication [Dckt. 89] (the "Notice"). The Defendant, Bobby Keith Adkins, did not respond to the Notice. The additional issues for adjudication, however, were previously the subject of a dispositive motion by Quality Car and Truck Leasing, Inc., upon which Mr. Adkins was provided a *Roseboro* notice, to which he responded.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J). The Court has jurisdiction pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334.

Bobby Keith Adkins filed his Chapter 7 Petition on April 23, 2014. During the pendency of his case, the Chapter 7 Trustee filed a Report of Assets and Request to Issue Claims Notice on August 28, 2014 [Main Case Dckt. 59]. However, that Report was withdrawn on December 20, 2016, and a Report of No Distribution was issued on the same day (doc. 94). Quality Car objected to that withdrawal, but later withdrew its objection [Main Case Dckts. 95 & 116]. A discharge was granted Mr. Adkins on October 19, 2017, in error.

**I.**

The above-captioned adversary proceeding was initiated when Quality Car and Truck Leasing, Inc. ("Quality Car") filed a Complaint on July 18, 2014. The Complaint requested relief under Bankruptcy Code sections 523(a)(2) and 727(c), (d), and (e). Mr. Adkins filed his Answer on August 20, 2014. Quality Car filed a Motion for Default Judgment in May of 2015, to which Mr. Adkins responded and Quality Car replied. After a hearing in September of 2015, the Motion for Default Judgment was denied, but the Court ordered Mr. Adkins to fully cooperate with the Chapter 7 Trustee in identifying and liquidating assets, and to provide his tax returns, his complete file regarding application for disability benefits, and all information regarding his employment since filing. [Dckt. 38].

Soon thereafter, Mr. Adkins' counsel withdrew from his representation in the adversary proceeding, and Mr. Adkins proceeded *pro se* as of December 30, 2015. Following discovery, Quality Car filed its Motions for Summary Judgment on September 15, 2016. It filed two – one requesting summary judgment based on section 523 of the Code, while the other dealt with section 727 of the Code [Dckts 71 & 73]. Following Mr. Adkins' response, filed on October 31, 2016, and Quality Car's Reply on November 7, 2016, the Court entered its Memorandum

Opinion and Order on February 15, 2017 (the "Memorandum Opinion"). The Memorandum Opinion granted partial summary judgment to Quality Car based on Code section 523(a)(6) and thus declared $90,743 of Quality Car's debt (the value of the missing collateral at the time of purchase plus $10,000 diverted by Mr. Adkins from an auction sale) nondischargeable. The Court also denied summary judgment pursuant to Code section 727(a)(2) as moot, but invited Quality Car to advise the Court as to whether any additional issues remained for adjudication prior to entry of a judgment order. [Dckt. 87]. Quality Car filed the Notice several days later, asking the Court to adjudicate the section 727 issues, and arguing that they were not mooted by the Memorandum Opinion. [Dckt. 89].

The Court also notes that Mr. Adkins filed a Motion to Reconsider the Memorandum Opinion which was denied on September 13, 2017 [Dckt. 96].

Mr. Adkins is a farmer and at the time he filed for bankruptcy, he owned three farms. [Motion for Summary Judgment, pp. 3-4]. He is familiar with buying and selling farm equipment and other types of automobiles, as he has done so for many years. [Main Case Dckt. 73, Exh. 1, pp. 62-63 of 278]. In fact, he agreed in a deposition with Ms. Wertman of the United States Trustee's Office that he basically had a business for his whole life where he bought and regularly sold farm equipment, trucks, and trailers. [*Id.*].

The three farms were divided up into three parcels of acreage: one 89-acre farm (the "89 Acre Farm"), one approximately nine-acre piece of land (the "9 Acre Farm"), and a third comprised of 161 acres, which is separate from the other two and was used for pasturage (the "161 Acre Farm").[1] [Motion for Summary Judgment, p. 4, Exh. 1-1]. Farm Credit of the Virginias

---

[1] The Court notes that these acreages and the division of these three properties were exceptionally difficult to divine from Exhibit 1-1 to the Motion for Summary Judgment, which is a document containing the annotated responses of Mr. Adkins to Quality Car's Second Set of

ACA ("Farm Credit") held a lien on the 161 Acre Farm and the 89 Acre Farm, less 6.95 acres where Mr. Adkins' personal residence was and is located. [Motion for Summary Judgment, p. 4]. In addition, Farm Credit claimed a lien in Mr. Adkins' personal property, which included livestock and equipment. [Main Case Dckt. 24].

In Mr. Adkins' bankruptcy case, Farm Credit filed a Motion for Relief from Stay on July 25, 2014. [*Id.*]. Farm Credit's Motion for Relief requested that the stay be lifted as to all of its collateral: listed as two parcels of property (one comprised of 88.49 acres and the other 245.69 acres), along with farm equipment and cattle. [*Id.* at ¶ 7-8]. The Motion for Relief was granted on July 31, 2014, when the Court signed an Agreed Order and Amended Stipulation filed by Mr. Adkins' counsel, Counsel for Farm Credit, and the Chapter 7 Trustee. [Main Case Dckt. 28]. However, Quality Car filed a Motion in August of 2014 asking the Court to reconsider that grant of relief, claiming that Quality Car had perfected liens against Mr. Adkins' personal property via a judgment lien granted by the Circuit Court of Jackson County. [Main Case Dckt. 36]. The Court held a hearing on November 3, 2014. On April 30, 2015, Farm Credit filed a Report of Sale with the Court, indicating that the real estate collateral had been sold at auction on March 13, 2015. [Main Case Dckt. 87]. No mention was made, in either sale documentation, of livestock or equipment.2 [*Id.*].

---

Requests for Admission and Requests for Production of Documents. The difficulty arose from Mr. Adkins' incomplete and evasive responses, such as, (1) "[h]ow many times wi[]ll the court [a]llow [y]ou to ask [t]he same question?" (2) "[n]o- can you not see or hear 3 different properties . . ." and (3) "if you can read that is what was stated" and (4) "[y]es – I grew a few tomatoes to eat[.] Would you like a few[?]" [Motion for Summary Judgment, Exh. 1-1]. In some instances, he declined to answer, such as one inquiry concerning the location of certain specific items of equipment. [*Id.*].

2 Other than a mention in the Notice of Successor Trustee's Sale, which states that "any belongings remaining at the subject property after the sale will be deemed to constitute

Farm Credit eventually relinquished its secured interest (however, keeping an unsecured claim) in the livestock and equipment, leaving Quality Car to pursue an action against that collateral.[3] While this issue was progressing in the main case, Quality Car was pursuing the instant adversary proceeding and was attempting to locate the items of Mr. Adkins' personal property in which it had liens. [Motion for Summary Judgment, pp. 4-5].

In the instant adversary proceeding, Quality Car attempted several times to elicit information regarding the location of its collateral from Mr. Adkins via discovery, including requests for admission, interrogatories, and requests for production of documents. [*Id.* at p. 5]. Following Quality Car's unsuccessful attempts at discovery, the Court entered an order requiring Mr. Adkins to respond to the discovery requests or suffer the imposition of sanctions. [Dckt. 53]. Mr. Adkins ultimately responded but, as noted in the margin, the responses are vague, confusing, at times disrespectful, and provide little to no helpful information. [Motion to Dismiss, Exhs. 1-1, 1-3].

The foreclosure sale that Mr. Adkins repeatedly refers to was performed by Farm Credit on March 13, 2015. [Main Case Dckt. 87]. Mr. Adkins emphatically claims that Farm Credit sold the equipment and livestock in question, and that he did not hide or dispose of the collateral. [Motion for Summary Judgment, Exh. 1-1]. Farm Credit sold the 161 Acre Farm to Francis Brothers Properties, LLC and the 89 Acre Farm to Eldon McCoy. [Motion for Summary Judgment, p. 6]. According to all of the sale documents, including the "Notices of Sale" (attached

---

ABANDONED PROPERTY AND WILL BE DISPOSED OF ACCORDINGLY." [Main Case Dckt. 87, Exh. A, ¶ 11, Exh. B, ¶ 11].

[3] The Court notes the absence of an order entered to this effect, but it is made clear from the Second Amended Statement attached to Farm Credit's Amended Claim 3-3, on the Main Case Claims Register.

as exhibits to Farm Credit's Report of Sale), no personal property was included in the March 13, 2015 sales. [*Id.* at pp. 6-7; Main Dckt. 87]. Further, Farm Credit sent Quality Car an affidavit regarding the foreclosure sale and Mr. Adkins' livestock and equipment. [*Id.* at p. 7 & Exh. 2]. In the affidavit, a representative of Farm Credit reiterated that Farm Credit relinquished its lien in the livestock and equipment, and that the "collateral" was not moved, removed, sold, or otherwise disposed of by Farm Credit during the foreclosure sale. [*Id.* at Exh. 2, ¶ 14.] Essentially, Farm Credit has no information about the "location of, the condition of, or what occurred with the [c]ollateral." [*Id.* at Exh. 2, ¶ 15].

As noted, Francis Brothers Properties, LLC ("Francis Brothers") purchased the 161 Acre Farm at the foreclosure sale. [*Id.* at p. 7]. Paul Francis, who is one of the Francis Brothers, allowed Quality Car to take his deposition. [*Id.*]. Mr. Francis testified at his deposition that he visited the land prior to purchasing it, and could tell that it was used for cattle grazing and hay production. [*Id.* at Exh. 3, p. 8, 15-16, p. 9, 18-19, pp. 9-10, 23-1]. At the time he visited, Mr. Francis saw no livestock; he instead observed farm gates and an old water well machine. [*Id.* at Exh. 3, p. 11, 10-15]. After purchasing the 161 Acre Farm, Mr. Francis said that he again observed no livestock or equipment on the property and that, in a "stunn[ing]" development, the water well machine and the farm gates had been removed. [*Id.* at Exh. 3, pp. 15-16, 15-10]. Mr. Francis never intended to, nor did he purchase, any livestock or equipment at the sale. [*Id.* at Exh. 3, p. 16, 11-19].

Also as noted, Eldon McCoy purchased the 89 Acre Farm at the foreclosure sale and sat for a deposition with Quality Car. [*Id.* at p. 8] He never intended to own the land. Instead, he made a deal with Jacob Adkins (Mr. Adkins' son) by which Mr. McCoy would purchase the land and sell it to Jacob Adkins in an owner-financed transaction. [*Id.* at Exh. 4, p. 26, 16-24].

6

When purchasing the land, he neither bought nor paid for any livestock or equipment. [*Id.* at Exh. 4, p. 50-51, 24-22].

From a historical standpoint, the farm equipment purchases by Mr. Adkins which were financed by Quality Car occurred during or prior to 2009. [Complaint, ¶ 9]. Mr. Adkins defaulted under these security agreements during or before 2009. Quality Car agreed to refinance the agreements, conditioned upon Jacob Adkins acquiescing to become a joint obligor and co-maker. [*Id.* at ¶ 10-11]. Under these refinanced agreements, upon which Mr. Adkins and Jacob Adkins were joint obligors, Quality Car was granted liens and security interests in 87 pieces or categories of equipment and vehicles. [*Id.* at ¶ 13]. Quality Car had VINS, bills of sale, serial numbers, purchase prices, and other documentation. [*Id.*]. It then properly perfected the liens by making UCC filings, holding first position on each of them. [*Id.* at ¶ 14].

Eventually, Mr. Adkins and Jacob Adkins defaulted on the refinance agreements. Quality Car made numerous attempts to locate and repossess the collateral, but the Adkins' refused to comply and allegedly "concealed and secreted" the equipment. Quality Car resorted to calling equipment dealers and auctioneers in an attempt to locate the equipment. Several transactions were uncovered, all which occurred either in 2009, 2010, or some unknown time. [Complaint, ¶¶ 18-36].

Following Mr. Adkins's default on the refinance agreements, and Quality Car's futile attempts to locate and repossess its collateral, Quality Car filed an action in Jackson County, West Virginia in August of 2009. [Complaint, ¶ 37]. The action was styled *Quality Car & Truck Leasing, Inc. v. Keith Adkins and Jacob Adkins*, Civil Action No. 09-C-130. Quality Car sought an order of immediate possession of the equipment it could not locate and damages. [*Id.*]. In December 2010, the Circuit Court compelled discovery responses from Mr. Adkins and Jacob

7

Adkins and, after the two failed to submit sufficient responses, the Circuit Court found that "the defendants had 'failed in their duties to respond to the discovery requests.'" [Complaint, ¶ 40]. In January 2011, the Circuit Court found that the two Adkins violated the December 2010 court order, and the violation was "willful and contumacious." [Complaint, ¶ 41. The Circuit Court levied a fine of $100 per day until answers were tendered to Quality Car's discovery requests. [*Id.*].

Eventually, the Jackson County Circuit Court entered judgment in favor of Quality Car in the amount of $281,459.83, plus interest of at least $83,523.47. [Proof of Claim 6-1, Exh. 2]. This judgment was a deficiency coming pursuant to Quality Car's motion for summary judgment.

To date, Quality Car is missing thirty-seven (37) pieces of collateral out of the eighty-seven (87) pieces it financed for Mr. Adkins. [Motion for Summary Judgment p. 1].

Importantly, nowhere does Mr. Adkins dispute that he owned the missing equipment and livestock.4 He listed on his original Schedule B several pieces of machinery and equipment, along with "45 head of Crossbred Cattle[,] 1 Angus Bull[, and] 20 X-Bred Calves," and valued the equipment at $20,000 and the cattle at $8,000. [Main Case Dckt. 1, Sched. B]. Furthermore, in his discovery "responses" to Quality Car's second set of interrogatories, he refers to the livestock in question by saying "[a]ll *my* livestock was owned by Farm Credit and claimed

---

4 The Court notes that Mr. Adkins, in his responses to Quality Car's Second Requests for Admission, also argues that the livestock in question belonged to his son, Jacob, by saying "the catle he keeps asking about on May [sic] 2014 belonged to Jacob Adkins as was his to sell and financed by F.H.A.! They were not mine and I have no records." [Motion for Summary Judgment, Exh. 1-1]. But, he goes on to say that "[a]nd also the cattle, equipment & [l]and was inspected by Farm Credit and its appraisers and was found satisfactory to them in July 2014, [l]ong after the sale of Jacob[']s cattle." [*Id.*]. From these two statements of Mr. Adkins', the Court cannot discern whether the livestock was indeed owned by Mr. Adkins or Mr. Adkins' son. However, the Court will rely on Mr. Adkins' bankruptcy schedules, as they are filed under penalty of perjury. His schedules indicated an ownership interest in equipment and livestock.

8

in Bankruptcy." [Motion for Summary Judgment, Exh. 1-1 (emphasis added)]. He further directs Quality Car to "[a]sk [F]arm Credit these things, they [s]old everything and should have the info[rmation] you want" when asked to account for the location of the missing livestock. [*Id.*].

Generally, it seems to be Mr. Adkins' pattern and practice to dispose of or transfer automobiles and equipment, followed by a failure of "recollection" or records to confirm his assertions. For example, he was asked in a deposition taken by the United States Trustee's Office about no fewer than twenty-four (24 vehicles) which were titled in his name, and he could not remember either the assets themselves or the disposition of at least eleven (11) of the vehicles. [Main Case Dckt. 73, Exh. 1, pp. 20-60 of 278].

In Mr. Adkins' handwritten Response to the Motions for Summary Judgment, he "object[s] to this judgment." [Dckt. 78, p. 1.] He asserts that he is unwell and is unable to "get around to collect some of this evidence." [*Id.*] Mr. Adkins claims that Quality Car knew of his health conditions prior to issuance of the loan, that "he was filing bankruptcy,"[5] and that the company took him on as a signer because he was "not incorporated and owned property." [*Id.*] Mr. Adkins further asserts that the loan from Quality Car was a "predatory one" and it was made to "cover up other mistakes." [*Id.*].

Mr. Adkins explains that he was making payments on the loan, but Quality Car began refusing payments made by his son when he was placed on a daily chemotherapy regimen, prior to the refinancing of the agreements. [*Id.*]. When Jacob Adkins became a joint obligor on the loan, he was only eighteen years old (18). [*Id.*].

---

[5] It is unclear from the Response who Mr. Adkins is referring to as "he." It may be Mr. Adkins himself, or it may be Mr. Mark Hatfield, who is referred to in the same sentence.

Mr. Adkins accuses his prior counsel of "only set[ting] [sic] around and listen[ing] to Mr. Vanderford's half truth and lies." [*Id.* at 2]. He admits that he "owed money to Quality, but it took both them and [him] to cause this mess." [*Id.*]. Mr. Adkins wishes "he could pay them, but [he is] broke and in poor health." [*Id.*]. He asks this Court to grant him "complete bankruptcy" and attaches medical records evidencing his inability to work in the future. [*Id.*]. Importantly, Mr. Adkins does not address or refute any of the specific allegations of conversion or concealment of assets.

In its Reply, Quality Car alleges that, since Mr. Adkins states he has "nothing left to sell or take," he must have sold his "rather extensive" collection of livestock and equipment. [Dckt. 82, p. 2.] Quality Car also points out that Mr. Adkins does not refute any of the factual statements made in the Motions for Summary Judgment and in the Complaint. Quality Car refers to Mr. Adkins' "predatory" characterization of the loan at issue as "fantastical and [] typical of Mr. Adkins' obfuscations and reliance upon his infirmities as an excuse for his behavior." [*Id.*].

Quality Car requests that the Court grant summary judgment under sections 727(a)(2) or (a)(5) of the Bankruptcy Code and deny Mr. Adkins a discharge.

## II.

**A. Governing Standards**

Federal Rule of Civil Procedure 56, made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), Fed. R. Bankr. P. 7056. When the moving

10

party makes an initial showing that there is no genuine issue of material fact, the nonmoving party must "go beyond the pleadings" and rely on some form of evidence, including affidavits, to demonstrate that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The nonmoving party must produce competent evidence that goes beyond "[c]onclusory or speculative allegations" and relies on more than "a mere scintilla of evidence." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (internal quotations omitted).

Chapter 7 discharges are governed by Bankruptcy Code section 727. Importantly, consistent with the "fresh start" policy of the Bankruptcy Code, debtors are entitled to discharges unless specific conditions are met. *Jenkins v. Simpson (In re Jenkins)*, 784 F.3d 230, 234 (4th Cir. 2015); *Tidewater Fin. Co. v. Williams*, 498 F.3d 249, 252 (4th Cir. 2007). These exceptions to discharge are laid out in section 727(a) and they are to be construed strictly against creditors and liberally in favor of debtors. *United States Trustee v. Seiber (In re Seiber)*, 489 B.R. 531, 544 (Bankr. D. Md. 2013) (citing *State Bank of India v. Chasalani (In re Chasalani)*, 92 F.3d 1300, 1310 (2d Cir. 1996)). However, this Court notes that discharges under section 727 are a privilege, not a right, and the privilege should only be afforded to the "honest but unfortunate debtor" which the Bankruptcy Code is designed to protect. *United States Trustee v. Rahmi (In re Rahmi)*, 535 B.R. 655, 660-61 (Bankr. N.D. W. Va. 2015). And, application of section 727 differs from section 523 in that, under section 727, *none* of a debtor's debts are discharged, whereas just one individual or one type of debt is withheld from discharge under section 523. *Husky Intern. Electronics, Inc. v. Ritz*, 136 S. Ct. 1581, 1589 (2016). Application of section 727 is highly fact-intensive and is designed to prohibit discharge for those who play "fast and loose with their assets or with the reality of their affairs." *Farouki v. Emirates Bank Intern., Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994);

*see also Ritz*, 136 S. Ct. at 1589 (describing § 727(a)(2) as a "blunt remedy for actions that hinder the entire bankruptcy process . . .").

The creditor or party moving for denial of discharge bears the burden of "proving its objection to the discharge under Bankruptcy Rule 4005" by a preponderance of the evidence. *Farouki*, 14 F.3d at 249. Once the creditor has established a *prima facie* case, the burden shifts to the debtor to "provide satisfactory, explanatory evidence." *Id.*

### 1. 11 U.S.C. § 727(a)(2)(B)

Under section 727(a)(2), discharge will not be granted to a debtor if certain stated circumstances exist:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate . . . has transferred, removed, destroyed, mutilated, or concealed . . .
>
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> >
> > (B) property of the estate, after the date of the filing of the petition.

11 U.S.C.S. § 727(a)(2). Essentially, this section "serves to deny a discharge when the debtor 'attempts to prevent the collection of his debts by concealing or disposing of assets.'" *Seiber*, 489 B.R. at 545 (quoting *Wachovia Bank, N.A. v. Voccia (In re Voccia)*, 477 B.R. 625, 631 (Bankr. E.D. Va. 2011) (quoting *Butler v. Ingle (In re Ingle)*, 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987)).

To meet the burden under section 727(a)(2)(B), the movant must prove four elements by a preponderance of the evidence: (1) a transfer of property; (2) belonging to the estate; (3) after the date of the filing of the petition; and (4) the intent to hinder, delay, or defraud a creditor or officer of the estate. *Sieber*, 489 B.R. at 545 (citing *First Union Nat'l Bank v. Golob (In re Golob)*, 252 B.R. 69, 78 (Bankr. E.D. Va. 2000)). And, under this subsection, a "transfer" means

"any transfer of an interest in property . . . including a transfer of possession, custody, or control, even if there is no transfer of title . . .". *Sieber*, 489 B.R. at 545; *Golob*, 252 B.R. at 78.

Regarding the first element -- transfer, removal, destruction or concealment -- concealment is defined by Black's Law Dictionary as "[t]he act of preventing disclosure or refraining from disclosing . . . [a] cover-up." *Black's Law Dictionary* (10th Ed. 2014). Courts have found certain types of circumstantial evidence to be highly relevant in cases of concealment, including:

> the debtor's sophistication to appreciate his responsibility to disclose his assets, representation by counsel, inordinately high number of omissions from statement, and pattern of reckless behavior toward his duties to the court. What is more, courts have considered a debtor's continued use and enjoyment of property not disclosed on his or her schedules, as well as the debtor's desire to retain beneficial use of the property throughout and after the case, as evidence of his or her intentional concealment. In the same way, the debtor's logical fallacies in explaining the reasons the debtor either forgot or declined to disclose the property are relevant.

*Id.* at 286 (internal citations omitted); *Wachovia Bank, N.A. v. Voccia (In re Voccia)*, 477 B.R. 625, 631 (Bankr. E.D. Va. 2011); *Korte v. IRS (In re Korte)*, 262 B.R. 464, 473 (8th Cir. B.A.P. 2001); *Kaye v. Hirsch (In re Hirsch)*, 14 B.R. 59, 63 (Bankr. S.D. Fla. 1981).

The most difficult element to establish is the fourth; the intent of the debtor to hinder, delay, or defraud. *BB&T Co. v. Evans (In re Evans)*, 538 B.R. 268, 284 (Bankr. W.D. Va. 2015). It is a question of fact and, "[b]ecause direct evidence of a debtor's intent to defraud is rare, courts consider the circumstantial evidence surrounding the debtor's actions to infer intent." *Id.* at 285 (citing *Webb v. Isaacson (In re Isaacson)*, 478 B.R. 763, 783 (Bankr. E.D. Va. 2012)). Further, because the intent requirement is "in the disjunctive," the intent "need not be fraudulent and it is sufficient that the intent be to hinder or delay." *Id.* at 286; *see also Cullinan Assocs., Inc. v. Clements*, 205 B.R. 377, 381 (W.D. Va. 1995). Specifically, the intent to hinder or delay "may

13

be inferred from an omission of valuable assets from a debtor's statement of affairs or schedules." *Id.* According to some courts, "reckless indifference to the truth is a functional equivalent of fraud. *Harmon v. McGee (In re McGee)*, 157 B.R. 966, 973 (Bankr. E.D. Va. 1993) (citing *Union Bank of the Middle East, Ltd. v. Farouki (In re Farouki)*, 133 B.R. 769, 780 (Bankr. E.D. Va. 1991)); *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir. 1987). Importantly, mere carelessness can "vitiate the inference of intent," but "the number and magnitude" of transfers may eliminate "any possible finding" of carelessness. *Aetna Insurance Co. v. Nazarian (In re Nazarian)*, 18 B.R. 143, 150 (Bankr. D. Md. 1982).

### 2. 11 U.S.C. § 727(a)(5)

Title 11 U.S.C. § 727(a)(5) provides pertinently that a discharge will not be granted to a debtor if:

> the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities . . .

11 U.S.C.S. § 727(a)(5). The initial burden is on the objector, and that entity must "establish that the debtor at one time owned a substantial identifiable asset, not too remote in time to the date of the commencement of the case; [and] that on the date of filing the voluntary petition the debtor no longer had the particular asset. *Sigmon v. Belk (In re Belk)*, 509 B.R. 513, 522 (W.D.N.C. 2014) (quoting *Menotte v. Hahn (In re Hahn)*, 362 B.R. 542, 548 (Bankr. S.D. Fla. 2007)). Generally, this means more than a showing that the debtor "cannot explain asset losses" – the objector must "produce evidence of a disappearance of substantial assets or transactions which concealed assets . . . ." *Miller v. Washabaugh (In re Washabaugh)*, 572 B.R. 141, 157 (Bankr. M.D.N.C. 2017) (citing *Reihm v. Park (In re Park)*, 272 B.R. 323, 332 (Bankr. D.N.J. 2001)). Importantly, unlike

section 727(a)(2)(B), there is no requirement for showing fraudulent intent. In the section 727(a)(5) context, "all an objecting creditor need do is identify missing assets; once that is done, the debtor must explain in a satisfactory manner the loss of those assets." *Belk*, 509 B.R. at 522 (quoting *Powers v. Ottoson-King (In re Ottoson-King)*, 3 Fed. Appx. 147, 151 (4th Cir. 2001)).

In providing an explanation for any missing assets, a debtor must be "reasonable and credible as to satisfy the court that the creditors have no cause to wonder where the assets went." *Belk*, 509 B.R. at 522 (W.D.N.C. 2014) (quoting *Ottoson-King*, 3 Fed. Appx. at 151). The explanation "must be more than a 'vague, indefinite, and uncorroborated hodgepodge of financial transactions.'" *Belk*, 509 B.R. at 522 (W.D.N.C. 2014) (quoting *Schechter v. Hansen (In re Hansen)*, 325 B.R. 746, 763 (Bankr. N.D. Ill. 2005)). Importantly, what matters is the "completeness and truth of the explanation." *Belk*, 509 B.R. at 522 (W.D.N.C. 2014) (quoting *Hansen*, 325 B.R. at 763).

A debtor may meet this burden by proving his "good faith and business-like conduct" in connection with the missing asset(s). *Belk*, 509 B.R. at 522 (citing *Schultz v. Shapiro (In re Shapiro)*, 59 B.R. 844, 848 (Bankr. E.D.N.Y. 1986)). But, the "failure to offer documentary evidence to corroborate a debtor's testimony as to the loss or disposition of assets may justify the denial of a discharge pursuant to Section 727(a)(5)." *Belk*, 509 B.R. at 522 (quoting *Ottoson-King*, 3 Fed. Appx. at 151). Importantly, the determination of whether the debtor's explanation is sufficient lies squarely within the court's discretion, and the court has "broad power to decline to grant a discharge in bankruptcy where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *Schlossberg v. Abell (In re Abell)*, 549 B.R. 631, 675-76 (Bankr. D. Md. 2016) (quoting *Ottoson-King*, 3 Fed. Appx. at 151).

B.  Analysis

Quality Car has not made the requisite showing of the elements under section 727(a)(2).  Prior to even reaching the "intent" element, the Court concludes that Quality Car has provided insufficient proof that any transfers of equipment or livestock were made after the date of the filing of the petition.  In fact, according to Quality Car's submission of evidence, many of the equipment transfers likely were made prior to the filing of the petition, as Quality Car obtained a judgment against Mr. Adkins regarding missing equipment in 2009.  And Quality Car reports that it attempted to find and repossess its collateral during the years of 2009 and 2010.  Further, regarding other equipment or livestock, all that Quality Car shows is that Mr. Adkins claimed equipment and livestock on his schedules at filing, and then individuals who purchased Mr. Adkins properties did not see any livestock or equipment in 2015.   And although that may show that Mr. Adkins disposed of collateral after filing, the proof does not rise to the level necessary for a Motion for Summary Judgment.

In contrast, Quality Car has made the necessary showing under section 727(a)(5).  Mr. Adkins acknowledged that he owned livestock and equipment on his schedules at filing.  He provided Farm Credit a security interest in the equipment and the livestock.  His land was used for pasturing and hay production.  He referred to *his* livestock in interrogatory responses (although he also tried to claim that some or all of the cattle belonged to his son, with no supporting evidence).  Thus, Quality Car has shown that Mr. Adkins possessed these assets at filing.  And, as a discharge has not been entered in this case (save for one mistakenly entered by the Court and now vacated as an error), Quality Car has also shown the unexplained loss of those assets prior to discharge.  Neither of the land purchasers reported seeing equipment or livestock on Mr. Adkins' properties, either before or after they purchased the land at auction in 2015.  Quality Car has not been able to

find the missing assets. Mr. Adkins claims that the collateral was taken or sold by Farm Credit, which is a fantastical assertion. Livestock and farm equipment are not small possessions that could be easily removed without Mr. Adkins' knowledge. The idea that Mr. Adkins has no idea where the equipment or cattle went is simply incredible and absolutely does not rise to the level of the showing required to defeat a motion under section 727(a)(5).

### III.

Based upon the foregoing, it is **IT IS ORDERED** that Quality Car and Truck Leasing, Inc.'s Motion for Summary Judgment [Dckt. 71] be, and is hereby, **GRANTED** to the extent set forth above**.**

**IT IS FURTHER ORDERED** that Bobby Keith Adkins be, and hereby is, **DENIED A DISCHARGE** in the above-captioned bankruptcy case, no. 2:14-bk-20211.

Counsel for Quality Car is directed to submit a proposed judgment order for entry on or before December 22, 2017.

The Clerk is directed to send a copy of this written opinion and order to counsel of record and Mr. Adkins, via certified mail, return receipt requested.